UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Megan Elizabeth McDonald

     v.                                                    Civil No. 22-cv-86-JL
                                                                  Opinion No. 2022 DNH 153
Kilolo Kijakazi, Acting Commissioner,
Social Security Administration

**<u>ORDER ON APPEAL</u>**

Megan McDonald appeals the Social Security Administration's ("SSA") denial of her

application for supplemental security income under Title XVI of the Social Security Act.  Ms.

McDonald filed an application on May 13, 2019, alleging disability beginning on May 13, 2019.

The Administrative Law Judge ("ALJ") denied her application, concluding that despite severe

impairments Ms. McDonald retained the residual functional capacity ("RFC") to do her past

work as a warehouse worker.  The Appeals Council denied Ms. McDonald's request for review

with the result that the ALJ's decision became the final decision of the Acting Commissioner.

On appeal, Ms. McDonald asks this court to reverse the Acting Commissioner's decision

and to remand the case for further administrative proceedings.  <u>See</u> LR 9.1(c).  The court has

jurisdiction under 42 U.S.C. § 405(g) (Social Security).  Ms. McDonald argues that the ALJ

erred by giving insufficient weight to certain opinions provided by her former and current

psychiatrists and her therapist. The Acting Commissioner objects and moves for an order

affirming the decision.  <u>See</u> LR 9.1(d).  For the reasons that follow, the court denies the Acting

Commissioner's motion and grants Ms. McDonald's motion.

## I.  **Applicable legal standard**

For purposes of review under § 405(g), the court "is limited to determining whether the

ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."

Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Sacilowski v. Saul, 959 F.3d 431, 437

(1st Cir. 2020).  Questions of law are reviewed de novo.  Seavey v. Barnhart, 276 F.3d 1, 9 (1st

Cir. 2001).  The ALJ's factual findings must be affirmed if they are supported by substantial

evidence.  Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  Substantial evidence is "more than

a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Id. at 1154 (cleaned up).  The court must affirm the ALJ's

findings, even if the record could support a different conclusion, when "a reasonable mind,

reviewing the evidence in the record as a whole, could accept it as adequate to support [the

ALJ's] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991); accord Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

To establish disability for purposes of supplemental security income under the Social

Security Act, an adult claimant must demonstrate an inability "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment . . .

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 1382c(a)(3)(A).  "An ALJ employs a five-step test to determine if an

individual is disabled within the meaning of the Social Security Act" that asks "questions that are

sequential and iterative, such that the answer at each step determines whether progression to the

next is warranted."  Sacilowski, 959 F.3d at 433.  The steps are:  (Step 1) whether the claimant is

currently engaging in substantial gainful activity; if not, (Step 2) whether the claimant has a

severe impairment; if so, (Step 3) whether the impairment meets or medically equals an entry in

the Listing of Impairments; if not, (Step 4) whether the claimant's residual functional capacity is sufficient to allow her to perform any of her past relevant work; and if not, (Step 5) whether, in light of the claimant's residual functional capacity, age, education, and work experience, she can make an adjustment to other work available in the national economy.[1] Id. (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v)); see §§ 416.920(a)(4)(i)-(v).[2] The claimant bears the burden of showing he is disabled through the first four steps, but at Step 5 the Commissioner must provide evidence to show that there are jobs in the national economy that the claimant can do. Sacilowski, 959 F.3d at 434.

## II. Background

The background information provided in the parties' factual statements is summarized here along with references to the administrative record ("Tr.").

### A. Mental heath care

Meghan McDonald states that she began treatment with psychiatrist Dr. Robert Ferrell in May of 2015. Dr. Ferrell confirmed on a mental health impairment questionnaire completed in December of 2017 that he did his first evaluation of Ms. McDonald in May of 2015 and that her mental health issues began when she was 13, which would have been in 1999. Tr. at 424 & 426. Dr. Ferrell diagnosed recurring major depression, attention deficit disorder, and bi-polar Type II. Tr. at 424. In February of 2019, Ms. McDonald went to a medical center with her brother

---

[1] Between Step 3 and Step 4, the court assesses the claimant's residual functional capacity to determine whether he has the capacity to work despite his limitations. 20 C.F.R. §§416.945(a).

[2] 20 C.F.R. Part 404 applies to claims for disability insurance benefits, while 20 C.F.R. Part 416 applies to claims for supplemental security income, but the regulations provide the same five-step analytical framework. See Reagan v. Sec'y of Health & Human Servs., 877 F.2d 123, 124 (1st Cir. 1989).

because of continuing plans to commit suicide. She was referred to respite care, but no beds were available.  She continued to see Dr. Ferrell on a monthly basis until her move to New Hampshire caused her to find other providers in July of 2020.

Ms. McDonald received individual therapy with Melissa Whitehouse LCSW from May of 2019 until her move to New Hampshire.  Ms. Whitehouse's notes reflect that McDonald had issues with alcohol abuse, that she was estranged from her children's father and was living with her mother and the children, and that she had difficulty managing her son's attention deficit and hyperactivity disorder symptoms.  She reported that she was sad and depressed most days, slept while her children were at school, was concerned about an investigation by the Department of Children and Families, had difficulty with parenting, but had stopped shoplifting.

After moving from Massachusetts to New Hampshire in June of 2020, Ms. McDonald established new health care relationships.  The nurse practitioner at her new family practice provider referred her for mental health care.  Ms. McDonald then met with Heather Merrill, M.A., at Community Partners.  Ms. Merrill diagnosed borderline personality disorder and obsessive-compulsive disorder and recommended that McDonald have individual therapy, psychiatric services, and case management.

In response, Ms. McDonald began therapy with Chelsea Mukon, MSW.  Ms. Mukon noted that Ms. McDonald was alert and oriented but showed poor insight and only fair judgment. Ms. McDonald reported thoughts of suicide but no plan.  Ms. McDonald explained that the tattoo on her face of a dying rose signified her belief that she is dying.

In September of 2020, Ms. McDonald established care with psychiatrist Paul Maguire. Based on the interview with Ms. McDonald, Dr. Maguire found she had fluctuating mood and thought content with obsessional thoughts but denied thoughts of suicide and homicide.  Ms.

McDonald's attention and concentration were adequate for the interview.  Dr. Maguire

diagnosed borderline personality disorder and obsessive-compulsive disorder.  He recommended

that she finish her current medication and then try a new medication on a trial basis.

In February of 2021, Ms. McDonald went to the hospital emergency room because of

suicidal thoughts. Following examination, she was discharged and instructed to follow up with

her providers.  Ms. McDonald had therapy with Ms. Mukon and treatment with Dr. Maguire,

who monitored and tried new medications.  She continued those relationships for the remainder

of the relevant period.

**B. Medical opinions**

Ms. McDonald was referred to Lynn Cattanach, Ph.D., for a consultative psychological

examination by Massachusetts Rehabilitation Commission Disability Determination Services.

The examination was done on August 18, 2017. Tr. at 412.  Dr. Cattanach summarized the

results as showing that Ms. McDonald had a mood disorder, anxiety, and a personality disorder.

Tr. at 415.  Based on her findings, Dr. Cattanach stated that McDonald had an adequate ability to

understand, remember, and carry out simple instructions but a moderately limited ability to

handle more complex or detailed instructions.  Tr. at 416.  She found that Ms. McDonald's

ability to do work-related activities consistently and reliably was at least moderately limited.  Id.

Ms. McDonald could tolerate minimal demands of simple-task work settings but should have

little interpersonal contact and no sustained contact with the general public.  Ms. McDonald

could tolerate simple changes in her work routine.  Because her ability to handle her personal

finances was limited, she would need assistance if she were granted benefits.

Ms. McDonald's previous psychiatrist, Dr. Ferrell, provided an opinion in December of

2017 on a Mental Health Impairment Questionnaire for the University of Massachusetts Medical

School Disability Evaluation Services.  Tr. at 424-29.  Dr. Ferrell provided diagnoses of recurring major depression, attention-deficit disorder, bi-polar type II, dependent personality, and hypoglycemia.  He stated that Ms. McDonald had chronic maladjustment to stress and that her concentration, attention, social skills might be affected by stress.  Several months later, in March of 2018, Dr. Ferrell provided additional opinions about her symptoms and stated that Ms. McDonald could not work at that time.  Tr. at 469.  In April of 2019, Dr. Ferrell completed a psychiatric disorder form with diagnoses of bipolar disorder, attention-deficit disorder, generalized anxiety, and alcohol abuse with moderate to severe symptoms, social isolation and impaired task completion.  Tr. at 557.  Dr. Ferrell answered questions about Ms. McDonald's daily activities and interpersonal relationships by stating that certain activities were impacted by anxiety, impaired concentration, impaired memory, and stress.  Tr. at 557-58.  Dr. Ferrell completed a second psychiatric disorder form in August of 2019 with the same diagnoses.  Tr. at 603.  He again responded to questions about Ms. McDonald's daily activities and interpersonal relationships by noting that she was impaired and impacted by stress.  Id.

In September of 2019, a state agency psychological consultant, Susan Witkie, M.D., reviewed Ms. McDonald's records and provided the opinion that McDonald had mild and moderate limitations in mental functioning.  Tr. at 95-97.  She determined that Ms. McDonald could sustain focus and pace at work for 2 hours at a time over an 8-hour work-day for 40 hours per week.  She was able to interact superficially with others and she was able to understand and respond to change.  Id.

Ms. Whitehouse completed a Massachusetts Disability Determination Services form in December of 2019.  Ms. Whitehouse described Ms. McDonald's activities and limitations, including difficulty with focus, social isolation, and poor judgment.  Ms. Whitehouse concluded

6

that Ms. McDonald would need continued support to function at a minimal level.  Tr. 608.  In June of 2020, Ms. Whitehouse completed a mental impairment questionnaire in which she wrote that Ms. McDonald remained severely depressed and was unable to do basic activities of daily living but was able to care for her children.  Tr. 622.  In most categories of mental abilities needed to so unskilled work, Ms. Whitehouse checked that McDonald had no useful ability to function.  Tr. 624.

Another state agency psychological consultant, Lois Condie, Ph.D., assessed Ms. McDonald's mental functioning based on her records as of January of 2020.  Dr. Condie determined that Ms. McDonald had mild to moderate limitations in mental functioning.  Dr. Condie's assessment of Ms. McDonald's work-related functioning was not significantly limited or moderately limited.  Tr. 109-110.

Dr. Maguire completed a Mental Impairment Questionnaire on June 21, 2021.  Tr. 765-771.  Dr. Maguire noted diagnoses for obsessive compulsive disorder and borderline personality disorder and that Ms. McDonald had had multiple failed medication trials.  For most of the mental abilities needed to do unskilled work, Dr. Maguire checked unable to meet competitive standards or no useful ability to function.  Among other explanations, Dr. Maguire wrote that Ms. McDonald had severe obsessive and compulsive symptoms, very poor impulse control, and extremes of behavior with insignificant provocation.  He also indicated that Ms. McDonald would miss more than four days of work per month and that her impairments would interfere with her ability to work at least 15% of the time.

### C. **Administrative proceedings**

Ms. McDonald filed an application for supplemental security income on May 13, 2019, in which she alleged a disability as of that date due to impairments resulting from borderline

personality disorder, obsessive-compulsive disorder, and major depressive disorder.  After her claim was denied in the initial administrative process, she sought a hearing before an ALJ.  The hearing was held on July 7, 2021, via online video.

The ALJ issued an unfavorable decision on September 29, 2021.  The Appeals Council denied review on January 11, 2022.  The denial made the ALJ's decision the final decision of the Acting Commissioner.

### III. <u>Analysis</u>

In her motion to reverse the Acting Commissioner's decision, Ms. McDonald contends that the ALJ improperly found that certain opinions provided by Dr. Ferrell, Ms. Whitehouse, and Dr. Maguire were not persuasive.  As a result, she contends, the ALJ's RFC assessment based only on the consultants' opinions is error.  The Acting Commissioner argues that the ALJ properly considered and weighed the medical opinions.

Under the current social security regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 416.920c(a).  Instead, an ALJ considers the supportability of the opinion, the extent to which the opinion is consistent with evidence from other sources, the medical source's relationship with the claimant, the specialization of the medical source, and certain other factors such as the familiarity of the medical source with the disability program.  § 416.920c(c).  The most important factors are supportability and consistency.  Purdy v. Berryhill, 887 F.3d 7, 13, n.8 (1st Cir. 2018); Susan R. v. Kijakazi, 2022 WL 16947800, at *3 (D.R.I. Nov. 15, 2022). In the decision, the ALJ will articulate how persuasive he or she found opinions from medical sources based on certain criteria.  § 416.920c(b).

## A. <u>Dr. Ferrell</u>

The ALJ rejected all six of Dr. Ferrell's opinions.  Ms. McDonald challenges the ALJ's assessment of Dr. Ferrell's opinions provided in April and August of 2019, which he did not find persuasive for purposes of the RFC because he did not provide a "function-by-function assessment of the claimant's limitations stated in work-related terms."  Tr. at 37.  The ALJ did not explain the source of that requirement for a medical opinion.

In his motion to affirm, the Acting Commissioner argues that Dr. Ferrell's opinions used terminology that was not sufficiently specific for the ALJ to credit or reject the opinions. The Acting Commissioner contends that the cited opinions were not medical opinions because they lacked an assessment of Ms. McDonald's "maximum, function-by-function abilities."  Doc. 11-1, at 12.  The Acting Commissioner also argues that the ALJ's assessment of a different opinion, given in May of 2020, shows that Dr. Ferrell's opinions are not supported by the record.

As Ms. McDonald asserts, the regulations direct the ALJ to consider the consistency and supportability of a medical opinion, not whether it provides a function-by-function assessment of the patient's functional capacity.  See § 416.920c(c); Hale v. Kijakazi, No. CV 21-53-H-JTJ, 2022 WL 14654959, at *6 (D. Mont. Oct. 25, 2022).  Under the regulations and for purposes of a social security application, "[a] medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:  . . .  (ii) [y]our ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting."  20 C.F.R. § 416.913(a)(2); Devine v. Kijakazi, --- F. Supp. 3d ---, 2022 WL 4134499, at *11 (D. Mass. Sept. 12, 2022).  A medical

opinion is not required to include a function-by-function assessment of the claimant's RFC. *Jimenez v. Kijakazi*, 2022 WL 4794878, at *8 (S.D. Fl. Sept. 14, 2022); but see *Kropelnicki v. Kijakazi*, 2022 WL 4390646, at *8 (S.D. Tex. Sept. 5, 2022) (holding that letter from a doctor that said he would not release claimant into the workforce was not a medical opinion under § 416.913(a)); *Cubano v. Kijakazi*, 2022 WL 509330, at *11 (M.D. Pa. Feb. 18, 2022) (holding that doctor's letters not medical opinions when they stated only that claimant was disabled and unable to work).

Dr. Ferrell's medical opinions provided in April and August of 2019 were his responses to questions on forms provided to him to assess Ms. McDonald's psychiatric disorders. In April, Dr. Ferrell's answers described the limitations Ms. McDonald experienced and the impact on her ability to function. He wrote that her daily function is impacted by anxiety to the extent she could not complete tasks, that her memory was impaired when she is distracted so that she makes multiple attempts to complete tasks, that she was socially avoidant because of anxiety, and that she had a low tolerance for stress, among other things. Dr. Ferrell also cited McDonald's therapist as another source of information.[3] In August, Dr. Ferrell stated, among other things, that Ms. McDonald is prone to "self defeating interpersonal conflicts" with impaired social relationships, variable and intense emotional reactions to daily stress, and that her concentration was impacted by stress. Tr. 603.

As such, Dr. Ferrell provided statements about Ms. McDonald's impairments and limitations due to her mental disorders. He did not simply write a letter saying that she was disabled or unable to work. Therefore, the ALJ did not properly consider Dr. Ferrell's opinions

---

[3] Ms. McDonald's therapist at that time was Melissa Whitehouse, LICSW. As is discussed further below, the ALJ concluded that Ms. Whitehouse's opinions were not persuasive. Tr. at 37-38.

and erred in finding the opinions unpersuasive because they lacked a "function-by-function assessment."

The ALJ did address the supportability and consistency of Dr. Ferrell's opinion given in May of 2020.  There, the ALJ found the opinion was not supported by Dr. Ferrell's treatment notes and the record, which the ALJ represents shows "routine conservative mental health treatment during the relevant period with generally intact mental status examinations and improvement with treatment."  Tr. at 37.  The cited parts of the record include Dr. Ferrell's treatment notes that mostly reflect medication prescriptions, Ms. Whitehouse's notes that state that Ms. McDonald was depressed and anxious to the point she could not leave the house in March of 2020, and Ms. Mukon's notes that indicate serious mental impairment.  Therefore, the ALJ did not demonstrate that Dr. Ferrell's opinion in May of 2020 was unsupported or inconsistent with the record, and the Acting Commissioner has not shown that the ALJ's assessment of that opinion applies to the assessment of the April and August of 2019 opinions.

The ALJ's error in failing to consider Dr. Ferrell's opinions from April and August of 2019 under the required standard is sufficient to conclude that the decision must be reversed and the case remanded for further administrative proceedings.  See Weaver v. Kijakazi, 2022 WL 4592238, at *7 (E.D. Wis. Sept. 30, 2022).  The court briefly addresses the other opinions that the ALJ rejected as follows.

### 2. Melissa Whitehouse, LICSW

Ms. Whitehouse was Ms. McDonald's therapist during two time periods, first from April of 2012 to May of 2013, and the second from May of 2019 until June of 2020. Ms. Whitehouse provided two opinions on forms for mental impairment and psychiatric disorders, in December of 2019 and June of 2020.  On both forms, Ms. Whitehouse noted diagnoses of alcohol

11

dependence in remission, bipolar disorder, and depression.  For the December of 2019 opinion, Ms. Whitehouse answered questions on the form by describing Ms. McDonald's activities and relationships, memory, need for supervision, interaction with others, and ability to deal with stress, among other things.  For the June of 2020 opinion, indicated by check marks on the form Ms. McDonald's signs and symptoms of mental impairment and then assessed her abilities to do work as unable to meet competitive standards and having no useful ability to function.

The ALJ found Ms. Whitehouse's opinion in December of 2019 unpersuasive because "she did not provide a function-by-function assessment of the claimant's limitations stated in work-related terms."  Tr. at 37.  As is addressed above in the context of Dr. Ferrell's opinions, that assessment does not comply with § 416.920c.  The ALJ found that Ms. Whitehouse's second opinion, June of 2020, was not persuasive because it was not supported by Ms. Whitehouse's own treatment notes or the record.  The ALJ cited the same parts of the record that he cited to show that Dr. Ferrell's opinion was unsupported and inconsistent, but those treatment notes do not necessarily fulfill that purpose.  Therefore, again, the ALJ did not properly apply the standard for assessing medical opinions.

### 3. Dr. Maguire

The ALJ found that Dr. Maguire's assessment and opinion about Ms. McDonald's mental functioning, which mostly found that she was unable to meet competitive standards or had no useful ability to function, was unpersuasive because it was not consistent with his treatment notes.[4]  As Ms. McDonald points out in her memorandum, Dr. Maguire's treatment should be

---

[4] In support of his motion to affirm, the Acting Commissioner criticizes Dr. Maguire's statements in support of his opinion as symptoms reported by Ms. McDonald but not actual clinical findings. The ALJ did not rely on that basis for discounting Dr. Maguire's opinion. See Cano v. Saul, 2020 WL 1877876, at *10 (D. Mass. Apr. 15, 2020) (stating that reviewing court must rely on reasons given by agency for the decision and cannot credit post hoc rationalizations

considered in conjunction with the treatment notes of Ms. McDonald's therapy with Chelsea

Mukon, MSW, who worked with Dr. Maguire at Community Partners.  While Dr. Maguire

monitored Ms. McDonald for medication every six to eight weeks, Ms. Mukon met with Ms.

McDonald for individual therapy sessions on a weekly schedule.  Ms. Mukon's treatment notes

support the assessments provided by Dr. Maguire.

## IV.    Conclusion

For these reasons, Ms. McDonald's motion to reverse[5] is granted.  The Commissioner's

motion to affirm[6] is denied.

The decision of the Acting Commissioner is reversed, and the case is remanded pursuant

to Sentence Four of § 405(g) for further administrative proceedings.  The clerk of court shall

enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  December 19, 2022

cc:    Ivan A. Ramos, Esq.
       Bainbridge Testa, Esq.
       Candace H. Lawrence, Esq.

---

provided on review).  Further, in the context of mental health assessment, it is unclear that Dr.
Maguire cannot make the findings he stated based on Ms. McDonald's reported symptoms.  Dr.
Maguire's assessments that are quoted in the Acting Commissioner's memorandum show Ms.
McDonald's demeanor and function during the interviews with Dr. Maguire but do not
necessarily reflect her ability to function in a work setting.

[5] Doc. no. 8.

[6] Doc. no. 11.